

September 8, 2016

**VIA FEDERAL EXPRESS**

Part 1 Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl St.
New York, NY 10007-1312

**Re:     Application of DNAinfo New York to Unseal Court Records**

Dear Part 1 Judge:

I write on behalf of DNAinfo ("DNAinfo"), a neighborhood news publication in New York City and Chicago, to respectfully request that this Court unseal the docket, docket entries, transcripts, and other court documents concerning the federal criminal prosecution of Jona Rechnitz, a businessman who has reportedly pled guilty to certain federal crimes and is currently awaiting sentencing by this Court. DNAinfo understands that one of its editors, Janon Fisher, previously requested that this Court unseal court records concerning the prosecution of Mr. Rechnitz. *See* Letter, *In re Application of Janon Fisher Editor for DNAinfo New York*, 1:16-mc-00239-P1 (filed June 24, 2016), ECF No. 2 (the "Fisher Letter"). In late July, Judge Abrams denied Mr. Fisher's request. Memo Endorsement, *In re Application of Janon Fisher Editor for DNAinfo New York*, 1:16-mc-00239-P1 (July 27, 2016), ECF No. 6 ("Memo Endorsement").[1]

DNAinfo now writes to request, on its own behalf, access to the docket, docket entries, and other court documents and records, as well as unsealing of any transcripts of past proceedings and notice of upcoming proceedings in the criminal prosecution of Mr. Rechnitz that is pending before this Court (the "Rechnitz Case"). The total secrecy with which the Rechnitz Case has been prosecuted—despite the strong, legitimate interest of the public in his prosecution, and the fact that it has been publicly reported that Mr. Rechnitz has pled guilty and is cooperating with authorities in other prosecutions and investigations—is anathema to this country's longstanding tradition of openness in criminal cases and violates the public's First Amendment and common law rights of access to criminal proceedings and related court documents.

---

[1] The Fisher Letter and the Memo Endorsement, which was made upon a letter written by Mr. Fisher in reply to the government's opposition to Mr. Fisher's request to unseal (the "Reply Letter"), are attached hereto as Exhibits A and B, respectively. Both the Fisher Letter and the Reply Letter are incorporated by reference herein.

810 7th Ave. Suite 800 | New York, NY 10019
Main (646) 435-9100 | Fax (646) 368-6820
DNAinfo.com

By way of background, on July 7, 2016, two indictments were issued against a total of five men related to the bribery of New York City Police Department ("NYPD") and Correction Officers Benevolent Association ("COBA") officials.  The first indictment alleges that two NYPD officials accepted cash, gifts, and other bribes from Jeremy Reichberg and an individual identified as "CW-1" in exchange for favors and preferential treatment from the two officials and other members of the NYPD.  *See* Indictment, *United States v. Grant et al.*, 1:16-cr-00468-GHW (filed July 7, 2016), ECF No. 16 ("Grant Indictment").  The second indictment alleges that the president of COBA invested COBA money in a private hedge fund in exchange for a kickback. *See* Indictment, *United States v. Seabrook et al.*, 1:16-cr-00467-ALC (filed July 7, 2016), ECF No. 10 ("Seabrook Indictment").  The Seabrook Indictment alleges that an individual identified as "CW-1" facilitated the kickback scheme.  *Id.* at ¶ 6.

According to the indictments and complaints filed in these cases, CW-1 is a cooperating witness who has pled guilty to conspiring to commit honest services fraud in connection with these cases and is providing information to the government in the hope of obtaining leniency when he is sentenced.  *Id.* ¶ 6; Grant Indictment at ¶ 4; Compl., *United States v. Seabrook et al.*, 1:16-cr-00467-ALC, ¶ 8(f) (filed June 7, 2016), ECF No. 1 ("Seabrook Compl.).  Although these filings do not name CW-1, numerous public news reports have identified him as Mr. Rechnitz, a Brooklyn businessman. *See, e.g.*, William K. Rashbaum, Michael Winerip, & Michael Schwirtz, *Fraud Charges Against Jail Officers' Union Chief With a Taste for Luxury*, N.Y. Times (June 8, 2016), http://nyti.ms/1TVdhTV; John Riley & Anthony M. DeStefano, *NYPD officials arrested in corruption case, records show*, Newsday (June 20, 2016), available at https://perma.cc/6XXX-9KS9.  The news media has also reported that Mr. Rechnitz is cooperating with authorities who are investigating potential corruption related to Mayor Bill de Blasio's fundraising activities.  *See* Fisher Letter.

The Rechnitz Case appears to be entirely under seal.  There is no publicly available docket, and no documents filed with the Court in the Rechnitz Case are available publicly.  Accordingly, pursuant to the First Amendment and common law rights of access to criminal proceedings and related documents, DNAinfo hereby requests access to the docket, docket entries, and all other court documents and records, including any indictment, plea agreement, or any other documents currently under seal in the Rechnitz Case, access to any sealed transcripts of past proceedings, and notice of and the ability to attend any future proceedings, including sentencing proceedings in the Rechnitz Case.

## I.  Openness is a fundamental feature of the American criminal justice system.

There is an unbroken tradition of openness of criminal trials in the United States from colonial times to the present day that is deeply rooted in our history.  *See Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 564–69 (1980); *Sheppard v. Maxwell*, 384 U.S. 333, 349 (1966) ("The principle that justice cannot survive behind walls of silence has long been reflected in the 'Anglo-American distrust for secret trials.'" (quoting *In re Oliver*, 333 U.S. 257, 268 (1948)).  Indeed, the U.S. Supreme Court has recognized that openness is "an indispensable attribute" of criminal trials.  *Richmond Newspapers, Inc.*, 448 U.S. at 569.

Openness ensures the fairness of criminal proceedings.  It "discourage[s] perjury, the misconduct of participants, and decisions based on secret bias or partiality."  *Id.* at 569.  Public access to criminal trials also serves as a check upon the judiciary and prosecutors, as "the sure knowledge that *anyone* is free to attend gives assurance that established procedures are being followed and that deviations will become known."  *Press-Enter. Co. v. Superior Court*, 464 U.S. 501, 508 (1984) ("*Press-Enterprise I*") (emphasis in original); *see also United States v. Abuhamra*, 389 F.3d 309, 323 (2d Cir. 2004).  The press, in particular, plays a vital role in facilitating the kind of public oversight necessary to safeguarding the fairness and integrity of criminal proceedings.  As the U.S. Supreme Court has stated:

> A responsible press has always been regarded as the handmaiden of effective judicial administration, especially in the criminal field . . . . The press does not simply publish information about trials but guards against the miscarriage of justice by subjecting the police, prosecutors, and judicial processes to extensive public scrutiny and criticism.

*Sheppard*, 384 U.S. at 350; *see also Richmond Newspapers, Inc.*, 448 U.S. at 572–73 ("Instead of acquiring information about trials by firsthand observation or by word of mouth from those who attended, people now acquire it chiefly through the print and electronic media").

Openness also builds confidence in the criminal justice system by allowing the public to observe whether and how justice is being done.  *Richmond Newspapers, Inc.*, 448 U.S. at 571– 72; *United States v. Aref*, 533 F.3d 72, 83 (2d Cir. 2008) ("Transparency is pivotal to public perception of the judiciary's legitimacy and independence.").  In addition, "the open processes of justice serve an important prophylactic purpose, providing an outlet for community concern, hostility, and emotion."  *Richmond Newspapers, Inc.*, 448 U.S. at 571.  The "community therapeutic value" of a criminal trial "cannot function in the dark," as "no community catharsis can occur" if the public does not have access.  *Id.* at 570, 571.

In short, openness is a bedrock principle of the American criminal justice system that serves important values.  The wholesale, total sealing of a criminal prosecution like the Rechnitz Case offends this core principle and poses a serious threat to the integrity of criminal trials and the public's confidence in and respect for the legal system.  Among other things, it leaves the public ignorant as to the basis for the charges against Mr. Rechnitz, the terms of his plea deal, and the nature of his punishment, and it deprives the public of an opportunity to attend and observe any upcoming proceedings, including Mr. Rechnitz's sentencing.  Such extreme secrecy makes it impossible for the public to understand the prosecution of Mr. Rechnitz, let alone verify that it is being conducted fairly and properly.  It violates the public's First Amendment and common law rights of access, and is inimical to our criminal justice system.

**II.    The First Amendment and the common law afford the public a right of access to proceedings and court documents in the Rechnitz Case.**

*A.   The First Amendment and common law rights of access.*

Because openness is an essential feature of criminal proceedings in this country, the U.S. Supreme Court has recognized that the First Amendment provides the press and the public with a presumptive right of access to criminal trials and related proceedings. *See Richmond Newspapers, Inc.*, 448 U.S. at 580 (recognizing right of access to criminal trials); *Press-Enterprise I*, 464 U.S. at 510–13 (recognizing right of access to *voir dire*); *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 13 (1986) ("*Press-Enterprise II*") (recognizing right of access to preliminary hearings); *Waller v. Georgia*, 467 U.S. 39, 46 (1984) (indicating that First Amendment right of access would in most instances attach to suppression hearings). Moreover, the Second Circuit, as well as other federal appellate courts, have concluded that the constitutional right of access also applies "to written documents submitted in connection with judicial proceedings that themselves implicate the right of access." *In re N.Y. Times Co.*, 828 F.2d 110, 114 (2d Cir. 1987); *see also, e.g., In re Wash. Post Co.*, 807 F.2d 383, 390 (4th Cir. 1986); *Associated Press v. United States Dist. Court*, 705 F.2d 1143, 1145 (9th Cir. 1983). When the First Amendment right of access applies,[2] proceedings and documents may be sealed only if "closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Press-Enterprise I*, 464 U.S. at 510.

Similarly, under common law a presumption of access attaches to all "judicial documents"—*i.e.*, documents that are "'relevant to the performance of the judicial function and useful in the judicial process.'" *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006) (quoting *United States v. Amodeo*, 44 F.3d 141, 145 (2d Cir. 1995) ("*Amodeo I*"). If the common law right of access applies, a court must determine the weight afforded to the presumption of access and then balance competing considerations against it to determine if the presumption of access has been overcome. *Id.* at 119–120.

   B.   *The press and the public have a First Amendment right of access to the docket and docket entries in the Rechnitz Case.*

The Second Circuit has expressly recognized that the public has a First Amendment right to inspect docket sheets. *See Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 86 (2d Cir. 2004). Docket sheets provide "an index to the records of judicial proceedings," *id.* at 91, and "a map of the proceedings in the underlying cases," *id.* at 95. As such, they are an essential precursor to the public and press's ability to exercise their First Amendment right to access judicial proceedings. Without docket sheets, "the ability of the public and press to attend civil and criminal cases would be merely theoretical." *Id.* at 93.

Access to docket sheets also plays a central role in ensuring that the public has the ability to assert its right of access by challenging the closure of judicial proceedings or the sealing of documents. Recognizing that the U.S. Supreme Court has held that "'representatives of the press and general public must be given an opportunity to be heard on the question of their exclusion,'"

---

[2] In determining whether the right of access afforded by the First Amendment attaches to a particular proceeding or document, courts apply an "experience and logic" test, which considers both "whether the place and process have historically been open to the press and general public" as well as "whether public access plays a significant positive role in the functioning of the particular process in question." *Press-Enterprise II*, 478 U.S. at 8.

the Second Circuit has established procedures for providing notice to the public that must be followed before closing a proceeding to which the public has a right to attend. *In re Herald Co.*, 734 F.2d 93, 101–02 (2d Cir. 1984) (quoting *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 609 n.25 (1982) (internal quotation marks omitted)). Specifically, "a motion for courtroom closure should be docketed in the public docket files maintained in the court clerk's office." *Id.* at 102. Thus, dockets provide notice to the public and the press of the potential closure of a proceeding. Because dockets should also reflect motions to seal documents or simply the fact that certain documents are under seal, they also provide the public and the press with notice of potential or actual sealing of court documents.

The press and the public cannot challenge the closure of proceedings that they do not know are taking place or the sealing of documents that they do not know exist. Without access to the docket in the Rechnitz Case, the public and press have no notice of the time and place of future proceedings, such as Mr. Rechnitz's sentencing hearing, and, accordingly, no opportunity to attend or ability to object to any motion to close those proceedings. In addition, the press and the public have had no opportunity to challenge the sealing of any documents currently on file with the Court in the Rechnitz Case, and have been deprived of the opportunity to contemporaneously challenge the closure of any proceedings that have taken place thus far. *See Abuhamra*, 389 F.3d at 323 ("The American legal tradition has long assumed that '*contemporaneous review*' of criminal prosecutions 'in the forum of public opinion' serves as an important restraint on abuse of government power." (emphasis added) (quoting *In re Oliver*, 333 U.S. at 270)). Even if the press and the public later obtain a transcript of any closed proceedings that have already taken place—which they should be given access to—a transcript will not convey the full meaning of a proceedings the way in-person attendance does. *See United States v. Alcantara*, 396 F.3d 189, 199 (2d Cir. 2005). Accordingly, access to the docket in the Rechnitz Case is essential to preserve the public and the press's ability to exercise their First Amendment right to attend criminal proceedings and to be heard on the question of their exclusion or the sealing of a documents that have been or will be filed with the Court.

    C.   *The press and the public have a First Amendment and common law right of access to proceedings and court documents in the Rechnitz Case.*

DNAinfo understands that Mr. Rechnitz has entered into a plea agreement with the government, has pled guilty to conspiring to commit honest services fraud in connection with at least two cases, and is currently awaiting sentencing. The press and the public have a First Amendment and common law right of access to the indictment against Mr. Rechnitz and criminal complaint, if any, the plea agreement and any plea hearing, and any future sentencing hearing and related documents.

Court have generally recognized that the First Amendment and common law rights of access attach to indictments. *See United States v. Smith*, 776 F.2d 1104, 1112 (3d Cir. 1985); *United States v. Anderson*, 799 F.2d 1438, 1442, n.5 (11th Cir. 1986) (stating that an indictment is "entitled to the status of a public document"). These holdings reflect the longstanding practice that "[c]riminal proceedings cannot be said to be brought or instituted until a formal charge is openly made against the accused, either by indictment presented or information filed in court," *Post v. United States*, 161 U.S. 583, 587 (1896) (citing *Virginia v. Paul*, 148 U.S. 107, 119

(1893)), as well as the requirements of Federal Rule of Criminal Procedure 6(f), which requires that an indictment or information be presented in open court.  In addition, knowledge of the charges against a criminal defendant "is essential to an understanding of [a] trial" and to assessing its fairness and the performance of counsel and the court.  *Smith*, 776 F.2d at 1112. Similarly, courts have also recognized a presumption of access to criminal complaints pursuant to the First Amendment and common law.  *See In re Kansas City Star Co.*, 143 F.R.D. 223, 227 (W.D. Mo. 1992) (affidavit in support of criminal complaint); *United States v. Giordano*, 158 F. Supp. 2d 242, 244 (D. Conn. 2001) (same).  Thus, under the First Amendment and common law, there is a strong presumption in favor of public access to the indictment filed against Mr. Rechnitz, as well as any criminal complaint.

The Second Circuit has also recognized a First Amendment right of access to plea hearings and plea agreements.  *See United States v. Haller*, 837 F.2d 84, 86 (2d Cir. 1988).  In doing so, the Second Circuit found that "[p]lea hearings have typically been open to the public, and such access . . . serves to allow public scrutiny of the conduct of courts and prosecutors." *Id.* (internal citation omitted); *see also United States v. Danovaro*, 877 F.2d 583, 589 (7th Cir. 1989) ("Public access to [guilty pleas] reveals the basis on which society imposes punishment . . . ."); *In re Wash. Post Co.*, 807 F.2d at 389 ("The presence of the public [at plea hearings] operates to check any temptation that might be felt by either the prosecutor or the court to obtain a guilty plea by coercion or trick.").  Moreover, because guilty pleas have, to a large extent, taken the place of criminal trials, *see Brady v. United States*, 397 U.S. 742, 752 (1970) (well over three-fourths of criminal convictions rest on guilty pleas), access to plea hearings and plea agreements is essential to preserving the public's ability to understand and monitor the criminal justice system.  *See Haller*, 837 F.2d at 87; *In re Herald Co.*, 734 F.2d at 98 ("It makes little sense to recognize a right of public access to criminal courts and then limit that right to the trial phase of a criminal proceeding, something that occurs in only a small fraction of criminal cases."). Accordingly, the First Amendment and common law rights of access apply to the plea hearing and plea agreement in the Rechnitz Case.

Finally, the Second Circuit and New York federal district courts have also held that sentencing proceedings and documents, other than pre-sentence reports, are subject to the First Amendment and common law rights of access.  *See Alcantara*, 396 F.3d at 191–92 (recognizing First Amendment right of access to sentencing proceedings); *United States v. Dare*, 568 F. Supp. 2d 242, 244 (N.D.N.Y. 2008) ("It is well-recognized that the public has a strong right to sentencing memoranda under the First Amendment and the common law right to judicial records").  In *Alcantara*, the court found that both longstanding experience and logic favor a First Amendment right of access to sentencing proceedings.  In this regard, the court found a history, dating back centuries, of sentences being "imposed in open court," 396 F.3d at 197, and that "the sentencing phase of a case has similar features to a trial" and "the absence of a jury at sentencing increases the need for public access to the proceedings," *id.* at 198; *see also In re Wash. Post Co.*, 807 F.2d at 389 (finding that public access to sentencing serves as a check upon "arbitrary or disproportionate sentence[s].").  In addition, the court recognized the strong interest of members of the public, as well as victims and friends and family of the defendant, in attending sentencing proceedings.  *Alcantara*, 396 F.3d at 198.  Finally, much as with plea hearings, the court found that access to sentencing proceedings "is particularly important because most cases do not go to trial." *Id.* at 198–99.  In short, under this Circuit's precedent, the press and the

public have both a First Amendment and common law right of access to the future sentencing proceeding and related documents in the Rechnitz Case.

> D.  *No compelling interest overcomes the public's First Amendment and common law rights of access to the sealed docket, proceedings, and related documents.*

Under U.S. Supreme Court and Second Circuit precedent, the circumstances under which the press and the public can be barred from criminal proceedings or from accessing related documents to which the First Amendment and common law rights of access apply are limited. The government has not and cannot meet its burden to show that the First Amendment and common law rights of access have been overcome in the Rechnitz Case.

The First Amendment presumption of openness "may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Press-Enterprise I*, 464 U.S. at 510. The Second Circuit has adopted a four-step approach in analyzing restrictions on access to criminal proceedings or documents under the First Amendment. *See United States v. Doe*, 63 F.3d 121, 128 (2d Cir. 1995). First, the court must determine "if there is a substantial probability of prejudice to a compelling interest of the defendant, government or third party." *Id.* at 128 (footnote omitted). The more extensive the closure sought, the greater the burden on the movant to show prejudice. *Id.* at 129. "Second, if a substantial possibility of prejudice is found," the court "must consider whether 'reasonable alternatives to closure'" could protect against such prejudice. *Id.* at 128 (quoting *Press-Enterprise II*, 478 U.S. at 14). Third, if no reasonable alternatives are acceptable, the court must consider "whether, under the circumstances of the case, the prejudice to the compelling interest 'override[s] the qualified First Amendment right of access.'" *Id.* (quoting *Press-Enterprise II*, 478 U.S. at 9). Finally, if the court determines that closure is warranted, the closure order must be "narrowly tailored"—*i.e.*, no broader than necessary to protect the interest identified. *Id.*

Any order closing proceedings or sealing documents to which the First Amendment right of access applies must be supported by specific, on-the-record factual findings. *In re N.Y. Times Co.*, 828 F.2d at 116 (quoting *Press-Enterprise II*, 478 U.S. at 13–14). Such findings must be sufficiently detailed so as to permit appellate review. *In re Herald Co.*, 734 F.2d at 100; *see also Press-Enterprise I*, 464 U.S. at 510 ("The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered."). "Broad and general findings by the trial court . . . are not sufficient to justify closure." *In re N.Y. Times Co.*, 828 F.2d at 116.

Similarly, the common law presumption of access may be overcome only if, after balancing the interests in disclosure and the countervailing interests in sealing, "countervailing factors . . . so demand." *Lugosch*, 435 F.3d at 124 (internal quotations omitted). The burden is on the party seeking sealing "to demonstrate that that interests favoring non-access outweigh those favoring access." *Amodeo I*, 44 F.3d at 148. "Any restrictions on access should be supported by specific findings." *Id.*

The record does not demonstrate any interest, let alone a compelling one, for the continued wholesale sealing of the Rechnitz Case. The government has asserted that, "[a]s a general matter . . . it is the Government's practice to request sealing of materials relating to cooperating witnesses when sealing is necessary to protect the witness's safety, to protect the integrity of ongoing law enforcement efforts, and/or to protect the secrecy of sensitive matters affecting a criminal proceeding." Letter, *In re Application of Janon Fisher Editor for DNAinfo New York*, 1:16-mc-00239-P1 (filed July 26, 2016), ECF No. 4. However, sealing—let alone complete sealing of the kind at issue here—is not automatically justified just because a case involves a cooperating witnesses. *See Oregonian Publ'g. Co. v. United States Dist. Court*, 920 F.2d 1462, 1467 (9th Cir. 1990) (holding that sealing of a plea agreement was not justified where there "was no evidentiary support" for the claim that because the agreement contemplated the defendant's cooperation with the government, the defendant would be in danger if the plea agreement was disclosed). Rather, the government must show specific facts that demonstrate the actual existence of a compelling interest justifying sealing.

The government has not and cannot present evidence that sealing is necessary in the Rechnitz Case. The news media has publicly identified Mr. Rechnitz as CW-1. Thus, it is also public knowledge that Mr. Rechnitz has been indicted and entered into a plea agreement. *See* Seabrook Indictment ¶ 6; Grant Indictment at ¶ 4; Seabrook Compl. ¶ 8(f). In light of these disclosures, there is no scenario in which merely acknowledging the existence of the criminal prosecution of Mr. Rechnitz would so compromise a compelling government interest as to justify the total sealing of the docket. *See Hartford Courant*, 380 F.3d at 96 ("'There are probably many motions and responses thereto that contain no information prejudicial to a defendant, and we cannot understand how the docket entry sheet could be prejudicial.'" (quoting *In re State-Record Co., Inc.*, 917 F.2d 124, 129 (4th Cir. 1990)). Similarly, public access to the indictment or criminal complaint, if any, against Mr. Rechnitz would not harm any compelling government interest, as it would serve only to confirm what the public already knows.

In addition, Mr. Rechnitz's cooperation with the authorities in the two criminal prosecutions identified herein, as well as in investigations into potential corruption related to Mayor Bill de Blasio's fundraising activities, has also been widely reported. Accordingly, disclosure of Mr. Rechnitz's plea agreement would not pose any additional threat to any ongoing investigation or criminal proceeding. *Wash. Post v. Robinson*, 935 F.2d 282, 292 (D.C. Cir. 1991) (holding that where the news media had already reported a defendant's cooperation with authorities, disclosure of the contents of his plea agreement "could hardly have posed any additional threat to the ongoing criminal investigation"). For the same reason, disclosure of the plea agreement would not pose any additional threat to Mr. Rechnitz's safety. *Id.*; *In re Herald Co.*, 734 F.2d at 101 ("Though the basis for apprehending harm to the defendant is apparent, the record raises a question as to whether the information sought to be kept confidential has already been given sufficient public exposure to preclude a closure order on this account").

The Court's previous denial of Mr. Fisher's request to unseal is insufficient to support the continued sealing of the Rechnitz Case. The Court's denial stated, in its entirety:

> Having reviewed the government's sealed *ex parte* letter, Mr.
> Fisher's application is denied. To the extent that any relevant

criminal proceedings exist, the requirements of *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110 (2d Cir. 2006) and *United States v. Amodeo*, 71 F.3d 1044 (2d Cir. 1995) [("*Amodeo II*")] have not been violated, and to the extent no such proceedings exist, the request is moot.  So ordered.

*See* Memo Endorsement.  The Court did not identify the compelling government interest justifying sealing or any facts supporting a finding of such an interest.  Nor did the Court consider whether reasonable alternatives to sealing exist.  The Court's conclusory statement that the requirements of *Lugosch* and *Amodeo II* have been satisfied does not meet the requirement of specific, on-the-record findings of fact sufficient to permit appellate review.  *See In re N.Y. Times Co.*, 828 F.2d at 116.

For all of the foregoing reasons, DNAinfo respectfully requests that the Court enter an order directing the Clerk of the Court to immediately unseal and make public the docket, docket entries, and all other sealed documents in the Rechnitz Case, including any sealed transcripts of any previously held proceedings.  Thank you for your consideration of this request.

Respectfully submitted,


s/ Alfred Levitt

Alfred Levitt
General Counsel
DNAInfo
810 7th Avenue
New York, NY 10019
alevitt@hugollc.com

# EXHIBIT A

 NEW YORK



June 22, 2016   DOC # _1_

Hon. P. Kevin Castel
Daniel Patrick Moynihan United States Courthouse
500 Pearl St.
New York, NY 10007-1312

16 MISC 239

Dear Judge Castel:   MEMO ENDORSED

I am writing to you in your capacity as the Part 1 judge to request the unsealing of federal court records regarding Jona Rechnitz, a Brooklyn businessman implicated in a widespread corruption probe into the New York City Police Department and the New York City Office of the Mayor.

Because the case is sealed, it is unclear which federal judge is assigned to the case. Clerks for judges Forrest and Stein, who preside over the related open cases, said they are not assigned to the case. I ask that you relay my request to the appropriate authority.

I am an editor for the online publication DNAinfo New York, which covers politics, crime and neighborhood news throughout the five boroughs of New York. Our readership is deeply invested in the health of the city and the integrity of its public employees.

Mr. Rechnitz is known to be cooperating with federal investigators and has pleaded guilty to undisclosed federal charges. He is currently awaiting sentencing before the court.

The sealing of his criminal case no longer serves the purpose of justice. Mr. Rechnitz's involvement in the federal investigation into corruption in the NYPD and the Correction Officers Benevolent Association has been widely reported. His cooperation with federal prosecutors in the Southern District of New York was revealed Wednesday in a New York Times article and other publications, including DNAinfo.com. Any strategic advantage held by the U.S. Attorney's office in sealing the file has therefore been lost due to the disclosure of Mr. Rechnitz's role in the case.

Mayor Bill de Blasio and Police Commissioner William Bratton have both spoken publicly about the corruption investigation and have mentioned Mr. Rechnitz's involvement in the probe. Several high ranking police officers have been demoted, suspended or fired over their role in the alleged corruption. Federal prosecutors have subpoenaed records regarding Mr. Rechnitz's relationship with the NYPD.

810 7th Ave. Suite 800 | New York, NY 10019
Main (646) 435-9100 | Fax (646) 368-6820
DNAinfo.com

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 6-24-16

DNAinfo understands the balance the court must strike between maintaining the long history of openness and the protection of cooperating witnesses in public corruption cases, however we feel the scales have been tipped toward opening the file in light of recent reports previously mentioned.

Further, there is a strong public interest in unsealing the records and allowing the public fully to be informed not only about allegations that call into question the integrity of its local government, but also the way the judicial system addresses such cases.

The U.S. Supreme Court consistently has recognized that the public and press have a presumptive First Amendment right of access to judicial proceedings in criminal cases. *See Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 573 (1980) (plurality opinion) ("a presumption of openness inheres in the very nature of a criminal trial under our system of justice"); *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 602-03 (1982) (recognizing First Amendment access right and striking down statute that required "the exclusion of the press and general public during the testimony of a minor victim in a sex-offense trial"); *Press-Enterprise Co. v. Superior Court* (*Press-Enterprise I*), 464 U.S. 501, 505 (1984) (constitutional presumption of openness to voir dire proceedings); *Press-Enterprise Co. v. Superior Court* (*Press-Enterprise II*), 478 U.S. 1, 13 (1986) (recognizing right of access to preliminary hearings); *El Vocero de Puerto Rico v. Puerto Rico*, 508 U.S. 147, 149 (1993) (same); *Waller v. Georgia*, 467 U.S. 39, 47 (1984) ("any closure of a suppression hearing over the objections of the accused must meet the tests set out in *Press-Enterprise* and its predecessors").

The U.S. Supreme Court has recognized a common-law right "to inspect and copy public records and documents, including judicial records and documents." *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 597 (1978) (footnote omitted). The Third Circuit agreed, finding that in both civil and criminal cases "the existence of a common law right of access to ... inspect judicial records is beyond dispute." *Publicker Indus., Inc. v. Cohen*, 733 F.2d 1059, 1066 (3rd Cir. 1984). Many lower courts have recognized a *constitutional* right to court records as well. For example, the Second Circuit noted that it was following other circuits in "constru[ing] the constitutional right of access to apply to written documents submitted in connection with judicial proceedings that themselves implicate the right of access." *In re New York Times Co.*, 828 F.2d 110, 114 (2nd Cir. 1987) (citations omitted); *see also In re Providence Journal Co.*, 293 F.3d 1, 10 (1st Cir. 2002) ("this constitutional [access] right ... extends to documents and kindred materials submitted in connection with the prosecution and defense of criminal proceedings") (quoting *Globe Newspaper Co. v. Pokaski*, 868 F.2d 497, 502 (1st Cir.1989)); *Associated Press v. District Court*, 705 F.2d 1143, 1145 (9th Cir. 1983) ("the public and press have a first amendment right of access to pretrial documents in general").

Federal appellate courts have also recognized that the constitutional presumption of access applies to court dockets. The Second Circuit ruled that "the press and public possess a qualified First Amendment right of access to docket sheets" in part because "the ability of the public and press to attend civil and criminal cases would be merely theoretical if the information provided by docket sheets were inaccessible." *The Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 86, 93

(2004). Likewise, in *U.S. v. Valenti*, 987 F.2d 708, 715 (11th Cir. 1993), the court found that the district court's "maintenance of a dual-docketing system is an unconstitutional infringement on the public and press's qualified right of access to criminal proceedings."

In keeping with this long tradition, I ask that you as the Part 1 Judge direct my request to the appropriate authority to decide on unsealing the file broadly if possible or sealing narrowly if necessary.

Thank you for your time.

Sincerely,

Janon Fisher
Editor
DNAinfo New York
(646) 591-8732

cc: Assistant U.S. Attorney Russell Capone, Defense Attorney Alan Levine

(2004). Likewise, in *U.S. v. Valenti*, 987 F.2d 708, 715 (11th Cir. 1993), the court found that the district court's "maintenance of a dual-docketing system is an unconstitutional infringement on the public and press's qualified right of access to criminal proceedings."

In keeping with this long tradition, I ask that you as the Part 1 Judge direct my request to the appropriate authority to decide on unsealing the file broadly if possible or sealing narrowly if necessary.

Thank you for your time.

Sincerely,

Janon Fisher
Editor
DNAinfo New York
(646) 591-8732

cc: Assistant U.S. Attorney Russell Capone, Defense Attorney Alan Levine

        This is an application by the editor of an online publication to unseal and/or gain access to information regarding possibly pending criminal proceedings that the applicant asserts may be under seal. It is presented to the undersigned as the judge presiding in Part 1. The application should be filed and assigned a Miscellaneous docket number and the applicant shall cause it to be served upon the United States Attorney Office ("USAO") for this District. The USAO shall serve and file its response seven (7) days after service. The response need not, in the first instance, confirm the existence of any matter that is under seal but should address the lawfulness of its practices in obtaining sealing and delayed docketing orders and the scope of any right of public access thereto. Applicant may reply five (5) days thereafter. It will be heard by the Judge then presiding in Part 1.

SO ORDERED.

U.S.D.J.
Part 1
New York, NY
June 24, 2016

**The New York Times** http://nyti.ms/20BSppg

N.Y. / REGION

# De Blasio Plays Down Contact With Men at Heart of U.S. Inquiry

By WILLIAM NEUMAN   APRIL 13, 2016

Mayor Bill de Blasio said on Wednesday that he had conversations "over the course of 2014" and into the next year with two financial backers who are now at the center of a federal investigation, acknowledging more extensive contact with the men than he had previously.

But he refused to say what the conversations were about or how frequently they occurred.

Mr. de Blasio said that in response to news accounts of the investigation into fund-raising by the men, Jona S. Rechnitz and Jeremy Reichberg, he had instructed a lawyer for his political campaign to contact the office of Preet Bharara, the United States attorney for the Southern District of New York, which includes Manhattan.

"He reached out at my request and simply said, 'We'd like to be helpful in any way we can, happy to provide any information that would be helpful,'" Mr. de Blasio, a Democrat, said of the lawyer, Barry Berke. He added that he had no knowledge of any investigation beyond what he had learned from news reports, and that neither he nor anyone in his administration had been contacted by federal investigators regarding an inquiry into his campaign fund-raising that focuses on the two men.

Mr. de Blasio spoke shortly after the Police Department announced it had reassigned another top official as a result of the investigation into the two men. The official, Deputy Chief Andrew Capul, the executive officer of the Manhattan North

patrol borough, was transferred to an administrative position, becoming the fifth senior official to be reassigned because of the inquiry.

The authorities began looking at the activities of Mr. Rechnitz, a Manhattan real estate developer, and Mr. Reichberg, a Brooklyn businessman, during an investigation into an alleged Ponzi scheme in which the men were investors, according to people briefed on the matter.

The investigators then discovered a web of contacts between the two men and high-level Police Department officials. In questioning about 20 such officials, the investigators asked about links to the men and allegations of free trips and meals the men may have provided.

At the same time, the people briefed on the case said, the federal investigators were focusing on substantial donations that Mr. Rechnitz gave to Mr. de Blasio and groups allied with the mayor in 2013 and 2014, and other money he raised. They were also looking at Mr. Reichberg's role in hosting a fund-raiser at his Brooklyn home in May 2014, which was attended by the mayor. Both men were named to the mayor's inauguration committee in late 2013, along with a roster of more than 70 other supporters, including actors and writers.

The two men and the police officials have not been charged with a crime.

Mr. de Blasio said on Sunday that he had not met the two men until after he won the Democratic primary for mayor in September 2013 and was not particularly close to them, adding that he really had not "seen them in the last year or more."

The next day, the mayor said he knew of "no favorable municipal action that they got." He also said that would be the last time he answered questions about the men.

But on Wednesday, Mr. de Blasio announced that his lawyer had reached out to prosecutors and was then pressed again to provide more details about his relationship with the men.

"It's very simple," he said. "To the best of my memory, I did not know them before the fall of 2013."

During the general election campaign, he said, "they did a lot to support the effort," adding that it was "a very normal thing" to include them in the inauguration committee, which was a largely honorific body.

Referring to the May 2014 fund-raiser for the Campaign for One New York, a group organized to support the mayor's agenda, he said, "They held one event at one of their homes, which I don't remember really that well because it was just another event at someone's home." The event raised at least $35,000.

He continued, "And then I had some conversations with them over the course of 2014 but really haven't had many conversations since the beginning of 2015."

Asked for more information on the conversations, he said, "I've told you all I'm going to tell you for now."

Detailed records of the mayor's schedule kept by his office show no meetings or other contact with either of the men except for the May 2014 fund-raiser held at Mr. Reichberg's home in Borough Park, Brooklyn. A video posted online shows Mr. de Blasio arriving outside Mr. Reichberg's three-story brick home, with a mansard roof, and being greeted by a large crowd. A man can be heard telling the mayor that the crowd had waited for him for two and a half hours, and Mr. de Blasio responds incredulously before giving a bearhug to a man on the sidewalk.

In at least one respect, Mr. Rechnitz appeared to distinguish himself as a donor in a way that was likely to have caught the mayor's attention. In the fall of 2014, when Mr. de Blasio was making a major and ultimately unsuccessful push to help Democrats take control of the State Senate, a company controlled by Mr. Rechnitz donated $102,300 to the New York State Democratic Senate Campaign Committee. State records show that it was the single-largest donation to the committee; the only comparable donations were made by union-affiliated political action committees.

"Someone who makes a donation, that's their choice; they should expect nothing in return," Mr. de Blasio said. "You'd like to believe people are making donations because they think someone would be a good leader."

Referring to allegations against the few top officials, he said: "I'm not going to

prejudge them. They deserve due process, but anyone who accepts personal gifts in the year 2016 is not paying attention to today's ethics standards or the ethics training that I'm sure they were given along the way."

Prosecutors from Mr. Bharara's office have also joined an unrelated examination by the state attorney general of a series of transactions that have also raised questions about the conduct of officials in the de Blasio administration, a person with knowledge of the matter said. The transactions included the lifting of a deed restriction on a Manhattan nursing home that enabled its purchase by a luxury condominium developer for $116 million.

The person with knowledge of the matter said the federal prosecutors were monitoring the inquiry, but that it remained unclear whether the deals rose to the level of criminal conduct.

On Tuesday night, Mr. Bharara, who recently won convictions of prominent state legislators, said he would "keep looking hard at corruption in our legislative branch as we have been."

"But not just there," he added. "In the executive branch too, both in city and in state government. Executive offices in government are far from immune from a creeping 'show me the money' culture that has been pervading New York for some time now."

J. David Goodman, William K. Rashbaum and Rick Rojas contributed reporting.

A version of this article appears in print on April 14, 2016, on page A19 of the New York edition with the headline: De Blasio Plays Down Contact With Two Men at Heart of Corruption Case.

© 2016 The New York Times Company

N.Y. / REGION

# *De Blasio Donor Emerges as Key Witness in Corruption Case. What Else Does He Know?*

By WILLIAM K. RASHBAUM    JUNE 8, 2016



Jona S. Rechnitz has pleaded guilty to fraud conspiracy charges. Baruch Ezagui

Of all the charges and the allegations in a 17-page criminal complaint accusing a powerful New York City union leader of corruption, perhaps the most far-reaching development was woven into the legal boilerplate, essentially hiding in plain sight.

A person, referred to as "CW-1," for Cooperating Witness 1, had agreed to cooperate with federal prosecutors and the Federal Bureau of Investigation.

The cooperator's name was not mentioned in the complaint unsealed on Wednesday, but several people with knowledge of the matter said it was Jona S. Rechnitz, a central figure in one of the half-dozen continuing federal corruption investigations focused on Mayor Bill de Blasio's fund-raising.

Mr. Rechnitz, who has generously supported several of Mr. de Blasio's interests and served on the mayor's inaugural committee, has pleaded guilty to fraud conspiracy charges in connection with the corruption case against Norman Seabrook, the influential leader of the union that represents the city's correction officers, and another defendant, according to the complaint.

But the significance of his decision to join the roster of government

witnesses could go far beyond the case against the union leader, and have wide-ranging consequences for Mr. de Blasio.

The complaint in the corruption case, along with statements by Preet Bharara, the United States attorney for the Southern District of New York (whose office brought it), and interviews with people with knowledge of the fund-raising inquiries, strongly suggest that Mr. Rechnitz could serve as an important witness in at least one of the fund-raising matters.

At a news conference on Wednesday announcing the charges against Mr. Seabrook, Mr. Bharara declined to answer questions about the identity of CW-1 and the degree to which the witness could be helpful in other cases.

But he noted that "the complaint does say that he is assisting other investigations as well; that's all I'll say."

Almost all of the fund-raising investigations are being conducted by the same group of F.B.I. agents and federal prosecutors — two squads of agents known as C4 and C14 and the prosecutors in Mr. Bharara's public corruption unit — that handled the case against Mr. Seabrook, who was arrested along with Murray Huberfeld, a hedge fund financier.

While Mr. Bharara also declined to answer questions about the fund-raising inquiries during the news conference, he left little doubt that there were more public corruption cases on the horizon.

"As those of you who come here often appreciate, it is seldom the case that the bringing of a particular charge at a particular date is the end of the matter," he said. "We're still investigating lots of different things, and you should expect to see me again."

The accusations in the complaint do not involve Mr. de Blasio, nor are they related to any of the possible improprieties that are under scrutiny in the more than half a dozen inquiries swirling around the mayor and his aides. Mr. de Blasio, a Democrat, has steadfastly defended his fund-raising efforts.

However, the complaint notes that Mr. Rechnitz has pleaded guilty in

connection with the corruption case, "among other things," and is "providing information to the government in the hopes of obtaining leniency when he is sentenced."

It also says that Mr. Rechnitz has undergone "extensive debriefings," and that the information he has provided has been "reliable and corroborated by independent evidence."

A lawyer for Mr. Rechnitz, Alan Levine, declined to comment.

Investigators and others briefed on the matter have said the fund-raising inquiry that had once been focused on Mr. Rechnitz now centers on whether city officials provided him with some benefit for his real estate business in exchange for campaign contributions.

The development represented a stark turn of fate for Mr. Rechnitz, 33, who came to New York from Los Angeles to build things: condominiums, hotels and the like. But as he gained a footing in the city, he found that it was easier to build relationships, often founded on money.

He and another businessman, Jeremiah Reichberg, who also raised money for the mayor and served on the committee that planned his 2014 inaugural celebration, spent a good deal of time cultivating roughly a score of senior police officials, lavishing some with gifts and trips.

Mr. Reichberg, according to people briefed on the matter, is the man identified in the criminal complaint as Co-Conspirator 1 or CC-1, and also was involved in the alleged scheme, although he was not charged.

The complaint details a series of trips to the Dominican Republic, Israel and elsewhere that Mr. Seabrook took with Mr. Rechnitz, Mr. Reichberg and a top police official. All were paid for by Mr. Rechnitz.

The investigation has so far uncovered misconduct by nearly a dozen mostly senior police officials, including five chiefs who have filed for retirement as a result, and a number of other senior officials, who have been transferred to administrative posts pending possible discipline. One detective has been

fired.

Few of them are likely to be happy about their interactions with Mr. Rechnitz. Indeed, they may share the feelings Mr. de Blasio expressed on Wednesday, which seemed to tumble out when a reporter asked about his connection to the businessman.

"I wish I never met the guy," the mayor said.

### Correction: June 11, 2016

*An article on Thursday about Jona S. Rechnitz, a cooperating witness in a corruption case against the correction officers union leader and a central figure in one of the corruption investigations focused on Mayor Bill de Blasio's fund-raising, misstated Mr. Rechnitz's age. He is 33, not 26. The article also omitted a group of F.B.I. agents who are investigating some of the fund-raising issues. Besides the F.B.I. squad known as C14, a squad called C4 is also part of the inquiry.*

A version of this article appears in print on June 9, 2016, on page A16 of the New York edition with the headline: Cooperating Witness in Corruption Case May Assist in de Blasio Inquiries.
Order Reprints | Today's Paper | Subscribe

DOWNTOWN (//WWW.DNAINFO.COM/NEW-YORK/MANHATTAN/DOWNTOWN)

Crime & Mayhem (#www.dnainfo.com/new-york/topics/crime-mayhem)   Politics (#www.dnainfo.com/new-york/topics/politics)

# Correction Union Head Arrested on Fraud Charges in Federal Corruption Probe

By Murray Weiss (//www.dnainfo.com/new-york/about-us/our-team/editorial-team/murray-weiss), Aidan Gardiner (//www.dnainfo.com/new-york/about-us/our-team/editorial-team/aidan-gardiner) and Jeff Mays (//www.dnainfo.com/new-york/about-us/our-team/editorial-team/jeff-mays) | June 8, 2016 8:22am





▲ View Full Caption

DNAinfo/Ben Fractenberg

NEW YORK CITY — The head of the city's correction officers' union was arrested Wednesday morning in an ongoing federal probe into the NYPD and City Hall for his part in a yearslong fraud scheme involving wire-tapped phone calls and bribes delivered in expensive Ferragamo (http://www.ferragamo.com/shop/en/usa) bags, federal law enforcement authorities said.

Norman Seabrook, president of the Correction Officers' Benevolent Association (https://www.dnainfo.com/new-york/20160608/civic-center/corrections-union-head-arrested-federal-corruption-probe-sources-say), personally got tens of thousands of dollars in kickbacks for steering about $20 million in union money to the Platinum Partners hedge fund

of thousands of dollars in kickbacks for steering about $20 million in union money to the Platinum Partners hedge fund in a scheme dating back to December 2013, according to the U.S. Attorney's office.

Seabrook met Manhattan-based hedge fund manager Murray Huberfeld through a mutual friend, Jona Rechnitz, designated as "CW-1" in court papers, according to officials and sources.

► *Scroll down to read the court papers outlining Seabrook's alleged scheme*

Seabrook and Huberfeld, both of whom were arrested about 6 a.m. Wednesday in their respective homes, were charged with conspiracy to commit honest services wire fraud and honest services fraud, sources said.



**Ben Fractenberg**
@fractenberg

[ Follow ]

.@PreetBharara diagrams the Norman Seabrook corruption investigation @DNAinfo

12:53 PM - 8 Jun 2016

17      11

Rechnitz, a real estate mogul being investigated for the $35,000 he raised for Mayor Bill de Blasio's Campaign for One New York, pleaded guilty to fraud in hopes he might get some leniency when he's sentenced, federal prosecutors said.

Wearing flip-flops, jeans and an untucked dress shirt, Seabrook told reporters, "I feel like a million dollars" after his arraignment Wednesday afternoon. He was released on $250,000 bail.

► Here's What We Know About the Probe Into Mayor Bill de Blasio's Fundraising (https://www.dnainfo.com/new-york/20160428/civic-center/heres-what-we-know-about-probe-into-mayor-bill-de-blasios-fundraising)
► Who's Who in the Federal NYPD/City Hall Corruption Probe (https://www.dnainfo.com/new-york/20160411/civic-center/whos-who-fbis-nypdcity-hall-corruption-probe)
► De Blasio Campaign to Return $32,200 After DNAinfo Finds Shady Donations (https://www.dnainfo.com/new-york/20160530/glendale/de-blasio-campaign-return-56700-after-dnainfo-finds-shady-donations)

Seabrook, who has worked as a correction officer since 1985, traveled to the Dominican Republic with Rechnitz in late 2013 and confided in him during a night of drinking that he wanted to get bribed to invest his union's money, prosecutors said.

"[It's time that] Norman Seabrook got paid," Seabrook said, according to the complaint against him.

Rechnitz acted as an intermediary between Seabrook and Huberfeld, relaying terms of the deal and eventually carrying kickbacks to the union boss, prosecutors said.

"How much is Norman Seabrook going to get paid?" Seabrook asked Rechnitz, who told him that he could net up to $150,000 depending on the hedge fund's profit.

In one kickback payment on Dec. 11, 2014, Rechnitz went to Seabrook's favorite luxury goods store in Manhattan, Salvatore Ferragamo and bought an $820 bag, prosecutors said. He filled it with $60,000 and brought it to Seabrook who was only a couple blocks away, feds said.

Seabrook became enraged when Rechnitz told him how much was inside because he didn't think it was enough, according to an affidavit from FBI Special Agent Blaire Toleman contained in Seabrook's federal complaint.

The trio hoped to hide the bribes by drafting fake invoices showing that Huberfeld's hedge fund paid Rechnitz for his season tickets to the Knicks, Toleman said.

"At the time of this supposed payment of $7,500 per game, the New York Knicks' record was 4-20," the complaint against Seabrook reads.

Huberfeld's fund never got the Knicks tickets, prosecutors also noted.

Between January and May 2015, FBI investigators recorded phone calls between Huberfeld and Rechnitz's embattled partner Jeremy Reichberg, who also raised $35,000 for the mayor's nonprofit and allegedly wooed NYPD officers with lavish trips.

Reichberg was identified in Seabrook's federal complaint as co-conspirator-1 or CC-1 who boasted, "I have the right connections and I might as well use mine."

Huberfeld would sometimes refer to money as "gelt" and "pressured" Reichberg to convince Seabrook to invest more union dollars in his hedge fund, prosecutors said.

"What are we doing about getting Murray more money," Huberfeld asked Reichberg, referring to himself in the third person.

Huberfeld wanted more COBA investments because other clients kept withdrawing as much as $44 million from the hedge fund, prosecutors said.

But Seabrook couldn't invest more money because he was having some of his own internal problems, prosecutors said. A former union board member, whom Seabook had fired, was suing him for violating union rules and improperly investing in Huberfeld's Platinum fund.

"There's no money now [because of an] internal problem with a guy," Rechnitz told Reichberg.

After the union boss's arraignment Wednesday afternoon, his lawyer, Paul Shechtman, disparaged the prosecutor's case and vowed take the charges to trial.

"Norman Seabrook has spent his entire life fighting," Shechtman, a former federal prosecutor, said. "He's not going to walk away from a fight. This is a one witness case. This witness has a lot of baggage."

The lawyer also took the opportunity to bash the Knicks.

"The only corroboration seems to be no one would pay $60,000 for Knicks tickets," Shechtman said.

Seabrook, who still works for the city's Department of Correction, will be suspended from that post, Mayor Bill de Blasio said at press conference Wednesday morning.

"These are allegations, but I'll say this: if proven true, it's disgusting and it's very, very sad. It means he stole money from his own workers. That's what it comes down to," the mayor said.

De Blasio said he's had a "very fraught" relationship with Seabrook, particularly over reforms the mayor wanted to make to Rikers Island.

"I just want to offer my thoughts to the people who work at Rikers and work in our Department of Correction," the mayor said.

"We are going to continue to effectively change the work we do, improve it, reform it. We're going to get past this moment and move forward," he added.

*Refresh this page for further updates.*

U.S. v. Seabrook and Huberfeld Complaint (https://www.scribd.com/doc/315160708/U-S-v-Seabrook-and-Huberfeld-Complaint)

**16 MAG  3626**

Approved: _Russell Capone_
MARTIN S. BELL / RUSSELL CAPONE / KAN M. NAWADAY
Assistant United States Attorneys

Before:   HONORABLE ANDREW J. PECK
          United States Magistrate Judge
          Southern District of New York

- - - - - - - - - - - - - -X        SEALED
UNITED STATES OF AMERICA        :    COMPLAINT

        - v. -                  :    Violations of
                                     18 U.S.C. §§ 1343, 1346,
NORMAN SEABROOK and             :    1349, 2
MURRAY HUBERFELD,
                                :    County of Offense:
        Defendants.             :    New York

- - - - - - - - - - - - - -X.

SOUTHERN DISTRICT OF NEW YORK, ss.:

        BLAIRE TOLEMAN, being duly sworn, deposes and says
that she is a Special Agent with the Federal Bureau of
Investigation ("FBI") and charges as follows:

                        COUNT ONE

        (Conspiracy to Commit Honest Services Wire Fraud)

# EXHIBIT B

                 NEW YORK

USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 7/25/16

July 8, 2016

Hon. Andrew L. Carter
Daniel Patrick Moynihan United States Courthouse
500 Pearl St.
New York, NY 10007-1312

# MEMO ENDORSED

Dear Judge Carter:    No pnc 2 3rd

The U.S. Attorney's response to my request to unseal the criminal case involving a cooperating witness in a federal public corruption investigation does not adequately justify closing the case to the public.

In keeping with the Honorable P. Kevin Castel's June 24, 2016 order, the U.S. Attorney sent a letter dated July 1, 2016 explaining the procedures and arguments for sealing criminal cases.

The judge instructed the federal prosecutors that they "need not, in the first instance, confirm the existence of any matter that is under seal."

It should be pointed out, however, that the government has already acknowledged the sealing of the criminal court case of CW-1, identified in DNAinfo and numerous other press outlets as Jona Rechnitz, in the US V. Seabrook case (16-MJ-3626 or 16-CR-00467).

In that case, Norman Seabrook, the former president of the Correction Officers Benevolent Association was accused of accepting kickbacks in exchange for steering union retiree benefits into the hedge fund operated by investment banker Murray Huberfeld. The federal investigator in the case states, "CW-1 has pleaded guilty to conspiring to commit honest services fraud in connection with, among other things, this matter and is providing information to the government in the hope of obtaining leniency when he is sentenced...CW-1 has done business with Huberfeld."

In fact, the government has made a de facto identification of CW-1 in their complaint against Seabrook and Huberfeld through the highly detailed complaint. Certainly his identity is no secret to Seabrook and Huberfeld, who considered him a "friend and sometimes business partner." Seabrook received cash, Knicks tickets and airfare from CW-1.

Seabrook and Huberfeld have known about the criminal investigation for many months and had ample opportunity to act against CW-1 for his cooperation with the federal government. On June 8, 2016, DNAinfo, The New York Times, the New York Daily News, the New York Post, NBC News, the Associated Press and other news outlets reported that Jona Rechnitz was the CW-1 identified in the criminal complaint (see attachment). There has been no indication that he has been threatened or harmed in the month that has passed since then.

810 7th Ave. Suite 800 | New York, NY 10019
Main (646) 435-9100 | Fax (646) 368-6920
DNAinfo.com

Nowhere in criminal complaint or the subsequent indictment against the union boss and the hedge fund manager does it suggest that they are prone to violence, nor that they have threatened to kill the cooperating witness. This appears to be a financial crime with a public corruption component. The lack of threat eliminates the need to seal the file for the protection of the defendant in the case.

For these reasons and reasons already stated in my previous request, I ask that the case be unsealed.

Thank you for your time.

Sincerely,

Janon Fisher
Editor
DNAinfo New York
(646) 591-8732

cc: Assistant U.S. Attorney Russell Capone, Defense Attorney Alan Levine

The USAO shall, by July 26, 2016, submit a sealed *ex parte* letter to the Court indicating whether any possibly pending criminal proceedings that Mr. Fisher asserts may be under seal are in fact under seal or not and, if so, whether the requirements of *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110 (2d Cir. 2006) and *United States v. Amodeo*, 71 F.3d 1044 (2d Cir. 1995) have been complied with. Should no such proceedings exist, the USAO shall so indicate in its letter. So ordered.

U.S.D.J.
Part 1
July 25, 2016

Having reviewed the government's sealed *ex parte* letter, Mr. Fisher's application is denied. To the extent that any relevant criminal proceedings exist, the requirements of *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110 (2d Cir. 2006) and *United States v. Amodeo*, 71 F.3d 1044 (2d Cir. 1995) have not been violated, and to the extent no such proceedings exist, the request is moot. So ordered.

U.S.D.J.
Part 1
July 27, 2016

USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED JUL 27 2016